# EXHIBIT 1

JAN/15/2019/TUE 02:20 PM                    FAX No.                         P. 040/040

| | **SUM-100** |
|---|---|

## SUMMONS
### (CITACION JUDICIAL)

| | FOR COURT USE ONLY<br>(SOLO PARA USO DE LA CORTE) |
|---|---|

**NOTICE TO DEFENDANT:**
*(AVISO AL DEMANDADO):*

PREMIER NUTRITION CORPORATION; and DOES 1-25, inclusive,

**YOU ARE BEING SUED BY PLAINTIFF:**
*(LO ESTA DEMANDANDO EL DEMANDANTE):*

PATRICIA BLAND, individually and on behalf of all others similarly
situated,

**FILED BY FAX**
ALAMEDA COUNTY

January 15, 2019

CLERK OF
THE SUPERIOR COURT
By Cheryl Clark, Deputy

**NOTICE!** You have been sued. The court may decide against you without your being heard unless you respond within 30 days. Read the information below.

You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (www.lawhelpcalifornia.org), the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), or by contacting your local court or county bar association. **NOTE:** The court has a statutory lien for waived fees and costs on any settlement or arbitration award of $10,000 or more in a civil case. The court's lien must be paid before the court will dismiss the case.

*¡AVISO! Lo han demandado. Si no responde dentro de 30 días, la corte puede decidir en su contra sin escuchar su versión. Lea la información a continuación.*

*Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.sucorte.ca.gov), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.*

*Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.sucorte.ca.gov) o poniéndose en contacto con la corte o el colegio de abogados locales. AVISO: Por ley, la corte tiene derecho a reclamar las cuotas y los costos exentos por imponer un gravamen sobre cualquier recuperación de $10,000 ó más de valor recibida mediante un acuerdo o una concesión de arbitraje en un caso de derecho civil. Tiene que pagar el gravamen de la corte antes de que la corte pueda desechar el caso.*

| The name and address of the court is:<br>*(El nombre y dirección de la corte es):* Alameda County Superior Court | CASE NUMBER:<br>*(Número del Caso):* RG19002714 |
|---|---|

Rene C. Davidson Courthouse
1225 Fallon Street, Oakland, CA 94612

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
*(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):*

| | | |
|---|---|---|
| DATE: **January 15, 2019**<br>*(Fecha)* | Clerk, by *Cheryl Clark*<br>*(Secretario)* | , Deputy<br>*(Adjunto)* |

*(For proof of service of this summons, use Proof of Service of Summons (form POS-010).)*
*(Para prueba de entrega de esta citación use el formulario Proof of Service of Summons, (POS-010)).*

**NOTICE TO THE PERSON SERVED:** You are served
1. ☐ as an individual defendant.
2. ☐ as the person sued under the fictitious name of *(specify)*:

3. ☒ on behalf of *(specify):* Premier Nutrition Corporation

under: ☒ CCP 416.10 (corporation)          ☐ CCP 416.60 (minor)
       ☐ CCP 416.20 (defunct corporation)   ☐ CCP 416.70 (conservatee)
       ☐ CCP 416.40 (association or partnership) ☐ CCP 416.90 (authorized person)
       ☐ other *(specify)*:
4. ☐ by personal delivery on *(date)*:

Page 1 of 1

| Form Adopted for Mandatory Use<br>Judicial Council of California<br>SUM-100 [Rev. July 1, 2009] | **SUMMONS** | Code of Civil Procedure §§ 412.20, 465<br>www.courtinfo.ca.gov |
|---|---|---|

| | |
|---|---|
| 1 | BLOOD HURST & O'REARDON, LLP<br>TIMOTHY G. BLOOD (149343) |
| 2 | LESLIE E. HURST (178432)<br>THOMAS J. O'REARDON II (247952) |
| 3 | PAULA R. BROWN (254142)<br>501 West Broadway, Suite 1490 |
| 4 | San Diego, CA 92101<br>Tel: 619/338-1100 |
| 5 | 619/338-1101 (fax)<br>tblood@bholaw.com |
| 6 | lhurst@bholaw.com<br>toreardon@bholaw.com |
| 7 | pbrown@bholaw.com |
| 8 | Attorneys for Plaintiff |
| 9 | [Additional Counsel Appear on Signature Page] |

**FILED BY FAX**
ALAMEDA COUNTY

January 15, 2019

CLERK OF
THE SUPERIOR COURT
By Cheryl Clark, Deputy

CASE NUMBER:
RG19002714

10        **SUPERIOR COURT OF THE STATE OF CALIFORNIA**

11        **FOR THE COUNTY OF ALAMEDA – NORTHERN DIVISION**

| | |
|---|---|
| 12 | PATRICIA BLAND, individually and on behalf of all others similarly situated, | Case No. |
| 13 | | |
| 14 | Plaintiff, | **CLASS ACTION** |
| 15 | v. | **CLASS ACTION COMPLAINT FOR:** |
| 16 | PREMIER NUTRITION CORPORATION; and DOES 1-25, | 1. **VIOLATION OF CONSUMERS LEGAL REMEDIES ACT, CIVIL CODE §§ 1750,** *et seq.*; |
| 17 | inclusive, | 2. **VIOLATION OF THE UNFAIR COMPETITION LAW, BUSINESS AND** |
| 18 | Defendant. | **PROFESSIONS CODE §§ 17200,** *et seq.*; **and** |
| 19 | | 3. **UNJUST ENRICHMENT** |
| 20 | | |
| 21 | | (*UNLIMITED MATTER*-Amount demanded exceeds $25,000) |
| 22 | | **DEMAND FOR JURY TRIAL** |
| 23 | | |
| 24 | | |
| 25 | | |
| 26 | | |
| 27 | | |
| 28 | | |

BLOOD HURST & O'REARDON, LLP

00144554                      CLASS ACTION COMPLAINT

BLOOD HURST & O'REARDON, LLP

1     Plaintiff Patricia Bland alleges causes of action against Defendant Premier Nutrition

2    Corporation ("Premier" or "Defendant"), on behalf of herself and all others similarly situated,

3    alleges as follows:

4                     **NATURE OF THE ACTION**

5    1.    This is a consumer protection class action arising out of Defendant's false and

6    deceptive advertising dietary supplements. Defendant markets, sells, and distributes "Joint

7    Juice," a line of joint health dietary supplements.[1] Primarily through deceptive product

8    labeling, Defendant promises that Joint Juice will support and nourish cartilage, lubricate

9    joints, and improve joint comfort. These claimed health benefits are the only reason a

10    consumer would purchase Joint Juice. Defendant's advertising claims, however, are false,

11    misleading, and likely to deceive a reasonable person.

12    2.    The false and misleading advertising messages are communicated on the labels

13    of all Joint Juice-branded products and throughout Joint Juice marketing materials. It's labels

14    prominently state the Product "helps keep cartilage lubricated and flexible," and that

15    consumers should "drink daily for healthy, flexible joints."

16    3.    Plaintiff brings this action individually and on behalf of all other similarly

17    situated consumers to halt Defendant's dissemination of this false and misleading advertising

18    message, to correct the false and misleading perception it has created in the minds of

19    consumers, and to obtain redress for those who have purchased Joint Juice during the class

20    period.

21                  **JURISDICTION AND VENUE**

22    4.    This Court has jurisdiction pursuant to Article VI, Section 10 of the California

23    Constitution, because this case is not a cause given by statute to other trial courts.

24    5.    This Court has personal jurisdiction over Defendant because Defendant is

25    authorized to and does conduct business in California. Defendant has marketed, promoted,

26

27    [1]    The Joint Juice line consists of all Joint Juice-branded products, including: (1) Joint
Juice ready-to-drink supplement drink; (2) Joint Juice On-The-Go Drink Mix; and (3) Joint

28    Juice Easy Shot Supplement (collectively, "Joint Juice"). Plaintiff reserves the right to include
other Joint Juice products as a result of discovery.

00144554

distributed, and sold Joint Juice in California, and Defendant's headquarters and primary place of business is in California, rendering exercise of jurisdiction by California courts permissible.

6.    Venue is proper in this Court because Defendant is headquartered in this County, Defendant transacts substantial business in this County, and a substantial part of the events or omissions giving rise to the claim occurred in this County.

**PARTIES**

7.    Plaintiff Patricia Bland is a citizen of the State of California. At all times relevant to this action, she resided in Sherman Oaks, California. Plaintiff Bland was exposed to and saw Defendant's representations by reading the label of Joint Juice. In reliance on the joint health benefit representations, Plaintiff purchased in the State of California 6-packs of 8-ounce ready-to-drink bottles of Joint Juice on numerous occasions beginning in 2015 until approximately January of 2018. By purchasing the falsely advertised Joint Juice products, Plaintiff suffered injury-in-fact and lost money. Joint Juice does not provide the promised benefits. Had Plaintiff Bland known the truth about Defendant's misrepresentations and omissions at the time of her purchases, Plaintiff would not have purchased Joint Juice.

8.    Defendant Premier Nutrition Corporation ("Premier") f/k/a Joint Juice, Inc. is a corporation headquartered in Emeryville, California, and organized and existing under the laws of the state of Delaware. Premier's headquarters is located at 1222 67th Street, Suite 210, Emeryville, California, 94608. Prior to that, Premier was headquartered at 5905 Christie Avenue, Emeryville, California, 94608. As of August 2013, Premier became a wholly-owned subsidiary of Post Holdings, Inc. Premier is a manufacturer of nutritional supplements, including protein shakes, bars, and powders. Premier's primary brands include Premier Protein, Joint Juice, and PowerBar. Premier manufactures, advertises, markets, distributes, and sells Joint Juice to many thousands of consumers in California.

9.    Plaintiff is ignorant of the true names, capacities, relationships and extent of participation in the conduct alleged herein, of the Defendants sued herein as Does 1 through 25, but is informed and believes that said Defendants are legally responsible for the wrongful conduct alleged herein and therefore sue these Defendants by such fictitious names. Plaintiff

BLOOD HURST & O'REARDON, LLP

1  will amend this complaint to allege the true names and capacities of the Doe Defendants when

2  ascertained.

3      10.     Plaintiff is informed and believes that each Defendant acted in all respects

4  pertinent to this action as the agent of the other Defendants, carried out a joint scheme,

5  business plan or policy in all respects pertinent hereto, and the acts of each Defendant are

6  legally attributable to the other Defendants.

7                              **FACTUAL ALLEGATIONS**

8  *The Joint Juice Product and the Symptoms Joint Juice Purports to Treat*

9      11.     Since 1999, Defendant has distributed, marketed, and sold Joint Juice.

10     12.     Joint Juice is sold through a variety of third-party retailers, including Costco,

11 Sam's Club, Walgreens, CVS, Walmart, and Target. Defendant also sells Joint Juice directly

12 to consumers through its website.

13     13.     The Joint Juice products are available in: (1) drink mix packets, which retailed

14 for approximately $22 for a thirty-count box; (2) eight-ounce "ready-to-drink" beverage

15 bottles, which retail for approximately $30 for a thirty-pack, or approximately $6 for a six-

16 pack; and (3) Easy Shot™ liquid concentrate bottles, which retailed for approximately $15 for

17 a twenty-ounce bottle containing sixteen servings.

18     14.     According to the package label, Joint Juice contains glucosamine hydrochloride

19 and chondroitin sulfate. Each serving consists of 1,500 mg of glucosamine hydrochloride and

20 200 mg of chondroitin sulfate.

21     15.     Glucosamine hydrochloride is a combination of glucosamine (an amino sugar

22 compound produced by the body, and which can be isolated from shellfish) where the

23 glucosamine is combined with hydrochloric acid. Glucosamine is one the most abundant

24 monosaccharides (sugars) in the body.

25     16.     Defendant's target audience is people with osteoarthritis, including

26 undiagnosed early stage osteoarthritis that commonly accompanies aging. Sometimes called

27 degenerative joint disease or degenerative arthritis, osteoarthritis is the most common chronic

28 condition of the joints, affecting about 27 million Americans. Osteoarthritis can affect any

BLOOD HURST & O'REARDON, LLP

joint, but it occurs most often in knees, hips, hands, and the spine. According to the Arthritis Foundation, one in two adults will develop symptoms of osteoarthritis symptoms during their lives, and one in four adults will develop symptoms of hip osteoarthritis. The signs and symptoms of osteoarthritis include joint pain, joint tenderness, joint stiffness, and the inability to move ones joint through its full range of motion.[2] Symptoms may come and go, and can be mild, moderate or severe.[3] Osteoarthritis is slow developing disease, so many people live with the occasional aches, pains and stiffness it causes without the need to seek medical intervention. Instead, these consumers treat the symptoms themselves.

17.     Many of those who purchase Joint Juice have not yet been diagnosed with osteoarthritis. Knowing this, Defendant expressly and impliedly advertises that Joint Juice treats and provides relief from the same symptoms experienced by those people whose arthritis has been diagnosed.

**Defendant's False, Deceptive, and Misleading Advertising of Joint Juice**

18.     Since the launch of Joint Juice, Defendant, through its advertisements, including on the product packaging and labeling, has consistently conveyed to consumers that drinking Joint Juice supports and promotes joint health, reduces joint pain, reduces joint stiffness, helps to support and nourish cartilage, "lubricates" joints, and helps with "joint comfort."

19.     Defendant asserts that glucosamine hydrochloride and chondroitin sulfate are the active ingredients in Joint Juice that will deliver the promised benefits.

20.     Defendant states on Joint Juice's packaging and in Joint Juice's marketing materials that Joint Juice helps to support and nourish cartilage, "lubricate" joints, and improve joint comfort without any limitation on which joints, for adults of all ages and without any limitation on what stages of joint related ailments.

---

[2]     https://www.mayoclinic.org/diseases-conditions/osteoarthritis/symptoms-causes/dxc-20198250 (last visited December 19, 2018).

[3]     https://www.arthritis.org/Documents/Sections/About-Arthritis/arthritis-facts-stats-figures.pdf (last visited December 19, 2018).

BLOOD HURST & O'REARDON, LLP

00144554

BLOOD HURST & O'REARDON, LLP

21.     In its advertising materials, including on its packaging and labeling, Defendant also represents that Joint Juice was "originally developed for pro athletes by orthopedic surgeon Kevin R. Stone, M.D. to keep joints healthy and flexible."

22.     Defendant's marketing representations repeat and reinforce the claims made on the packaging and labeling for Joint Juice. For example, on its website, Defendant represents that "Research indicates that you should take a minimum of 1,500 mg of glucosamine daily got joint health. That's why we put 1,500 mg in every Joint Juice product" and "Glucosamine works to lubricate your joints by helping cartilage tissue absorb water. This helps cartilage perform its job of cushioning and mobility."[4]

23.     Defendant's advertising deceptively reinforces the health benefits message through references to "expert stories," including from Dr. Kevin Stone, Joint Juice's founder and co-owner. According to an article written by Dr. Stone and posted on Defendant's website, "[t]aking glucosamine and chondroitin together – in the liquid formula found only in Joint Juice® products – ensure that you get a full day's supply of glucosamine (1,500 mg) and chondroitin to maintain healthy and happy joints."

24.     Defendant's website also contains a prominent link to a "Joint Juice® joint health assessment." This marketing gimmick further reinforces the false and misleading representation that Joint Juice will provide the significant, advertised health benefits.

25.     The Joint Juice packaging also prominently features the Arthritis Foundation logo because it attracts purchasers who suffer from arthritis and joint pain. To reinforce the message, the labels state "Joint Juice is proud to support the Arthritis Foundation's efforts to help people take control of arthritis" or that Defendant "will donate a portion of the proceeds to the Arthritis Foundation … to help people take control of arthritis."

26.     Since 2010, Joint Juice ready-to-drink packaging has remained materially identical, always focused on the promised joint health benefits: "A bottle a day keeps your joints in play," "**Drink Daily for Healthy, Flexible Joints**," "**HELPS KEEP CARTILAGE LUBRICATED AND FLEXIBLE**," and "For Healthy, Flexible Joints."

---

[4]     http://www.jointjuice.com/faq/general-information (last visited January 15, 2019).

00144554

27.   Joint Juice's packaging appears as follows:

EasyShot™ Liquid Concentrate (Front)    EasyShot™ Liquid Concentrate (Back)

 

BLOOD HURST & O'REARDON, LLP

00144554

BLOOD HURST & O'REARDON, LLP

Drink Mix Box (Front)          Drink Mix Box (Back)

 

8-Ounce Ready-to-Drink Beverage Bottle Six-Pack



7

CLASS ACTION COMPLAINT

00144554



*Scientific Studies Confirm that Joint Juice Is Not Effective and Defendant's Health Benefits Message Is False and Deceptive*

28.     Despite Defendant's representations, glucosamine, alone or in combination with other ingredients including chondroitin sulfate, is not effective in providing the represented joint health benefits.

**Randomized Clinical Trials**

29.     Randomized clinical trials ("RCTs") are "the gold standard for determining the relationship of an agent to a health outcome." Federal Judicial Center, *Reference Manual on Scientific Evidence*, 555 (3d ed. 2011). "Double-blinded" RCTs, where neither the trial participants nor the researchers know which participants received the active ingredient is considered the optimal strategy.

30.     Glucosamine and chondroitin have been extensively studied in RCTs, and the well-conducted RCTs demonstrate that glucosamine and chondroitin, alone or in combination, are not effective at producing joint health benefits, including pain, stiffness, range of motion, flexibility, and cartilage benefits.

BLOOD HURST & O'REARDON, LLP

8

CLASS ACTION COMPLAINT

00144554

BLOOD HURST & O'REARDON, LLP

31.     In the late 1990s, the National Institutes of Health ("NIH") funded the $12.5 million multicenter GAIT study. GAIT was the first large-scale multicenter clinical trial in the United States on glucosamine and chondroitin. The first GAIT publication examined results from 1,583 subjects randomized to receive one of five treatments over 6 months: (1) 1,500 mg glucosamine hydrochloride, (2) 1,200 mg chondroitin, (3) glucosamine plus chondroitin, (4) celecoxib, or (5) placebo. The GAIT I publication, published in 2006 in the New England Journal of Medicine (the "2006 GAIT Study"), reported that glucosamine and chondroitin were not effective in reducing pain. *See* Clegg, D. et al., *Glucosamine, Chondroitin Sulfate, and the Two in Combination for Painful Knee Osteoarthritis*, 354 New England J. of Med. 795, 806 (2006) ("The analysis of the primary outcome measure did not show that either [glucosamine or chondroitin], alone or in combination, was efficacious.").

32.     Subsequent GAIT studies in 2008 and 2010 reported that glucosamine and chondroitin did not rebuild cartilage and were otherwise ineffective – even in patients with moderate to severe knee pain for which the 2006 reported results were inconclusive. *See* Sawitzke, A.D. et al., *The Effect of Glucosamine and/or Chondroitin Sulfate on the Progression of Knee Osteoarthritis: A GAIT Report*, 58(10) J. Arthritis Rheum. 3183–91 (Oct. 2008) ("GAIT II"). The GAIT II publication, which was based on 572 subjects across nine sites, reported no difference in joint space width between those receiving glucosamine and chondroitin or placebo.

33.     The 2010 GAIT III publication, with 662 subjects, also concluded glucosamine and chondroitin are no more effective in relieving pain than placebo. *See* Sawitzke, A.D., *Clinical Efficacy And Safety Of Glucosamine, Chondroitin Sulphate, Their Combination, Celecoxib Or Placebo Taken To Treat Osteoarthritis Of The Knee*: 2-Year Results From GAIT, 69(8) Ann Rhem. Dis. 1459-64 (Aug. 2010) ("GAIT III").

34.     The GAIT studies are consistent with the reported results of prior and subsequent studies. For example, a 1999 study involving 100 subjects by Houpt et al., entitled *Effect of glucosamine hydrochloride in the treatment of pain of osteoarthritis of the knee,*

00144554

BLOOD HURST & O'REARDON, LLP

1    26(11) J. Rheumatol. 2423-30 (1999), found that glucosamine hydrochloride performed no

2    better than placebo at reducing pain at the conclusion of the eight week trial.

3        35.     Likewise, a 2004 study by McAlindon et al., entitled *Effectiveness of*

4    *Glucosamine For Symptoms of Knee Osteoarthritis: Results From and Internet-Based*

5    *Randomized Double-Blind Controlled Trial*, 117(9) Am. J. Med. 649-9 (Nov. 2004),

6    concluded that "glucosamine was no more effective than placebo in treating symptoms of knee

7    osteoarthritis" – in short, that glucosamine is ineffective. *Id.* at 646 ("we found no difference

8    between the glucosamine and placebo groups in any of the outcome measures, at any of the

9    assessment time points").

10       36.     Many studies have also confirmed there is a significant "placebo" effect with

11    respect to consumption of products represented to be effective in providing joint health

12    benefits such as Joint Juice.

13       37.     Indeed, more than 30% of persons who took placebos in these studies believed

14    that they were experiencing joint health benefits when all they were taking was a placebo.

15       38.     A 2004 study by Cibere et al., entitled *Randomized, Double-Blind, Placebo-*

16    *Controlled Glucosamine Discontinuation Trial In Knee Osteoarthritis*, 51(5) Arthritis Care &

17    Research 738-45 (Oct. 15, 2004), studied users of glucosamine who had claimed to have

18    experienced at least moderate improvement after starting glucosamine. These patients were

19    divided into two groups – one that continued using glucosamine and one that was given a

20    placebo. For six months, the primary outcome observed was the proportion of disease flares in

21    the glucosamine and placebo groups. A secondary outcome was the time to disease flare. The

22    study results reflected that there were no differences in either the primary or secondary

23    outcomes for glucosamine and placebo. The authors concluded that the study provided no

24    evidence of symptomatic benefit from continued use of glucosamine – in other words, any

25    prior perceived benefits were due to the placebo effect and not glucosamine. *Id.* at 743 ("In

26    this study, we found that knee OA disease flare occurred as frequently, as quickly, and as

27    severely in patients who were randomized to continue receiving glucosamine compared with

28

00144554

1  those who received placebo. As a result, the efficacy of glucosamine as a symptom-modifying

2  drug in knee OA is not supported by our study.").

3      39.    To similar effect, in the "Joints on Glucosamine" or "JOG" study, Dr. Kwoh

4  and co-authors concluded that glucosamine was not effective in preventing the worsening of

5  cartilage damage or impacting joint pain or joint function. *See* Kwoh CK et al., *Effect of Oral*

6  *Glucosamine on Joint Structure in Individuals With Chronic Knee Pain: A Randomized,*

7  *Placebo-Controlled Clinical Trial*, 66(4) Arthritis Rheumatol., 930-9 (2014). JOG was a 201-

8  person, randomized clinical trial comparing those who consumed the same type of

9  glucosamine in Joint Juice and those consuming a placebo. The JOG study examined subjects

10  without arthritis. The JOG study concluded that glucosamine supplementation provided no

11  joint health, structural, pain or physical function benefits: "There was no difference between

12  the two groups" in terms of cartilage loss and "[t]here were no significant differences between

13  the glucosamine and control groups from baseline to the 12-week assessment, the 12-week to

14  24-week assessment, or from baseline to 24 weeks for the WOMAC pain or function subscales

15  or the total WOMAC score." *Id.* at 935.

16      40.    Runhaar et al. (2015) also examined subjects not diagnosed with arthritis and

17  found no benefits from glucosamine. Runhaar was an independently-analyzed double-blind,

18  placebo-controlled, factorial design trial testing a diet-and-exercise program and 1500 mg oral

19  glucosamine or placebo on 407 subjects. Runhaar et al., *Prevention of Knee Osteoarthritis in*

20  *Overweight Females: The First Preventative Randomized Controlled Trial in Osteoarthritis*,

21  Am J Med, 128(8):888-895 (2015). Researchers examined the impact of daily glucosamine

22  consumption on the incidence of knee osteoarthritis, as well as on pain and physical function.

23  After 2.5 years, no effect from glucosamine was found on subjects' overall quality of life or

24  knee pain, physical function, or the incidence of knee osteoarthritis.

25      41.    Based on data from 245 people without diagnosed osteoarthritis, de Vos et al.

26  (2017) determined the impact of glucosamine consumption over an average time period of 6.6

27  years. de Vos et al., *Long-term effects of a lifestyle intervention and oral glucosamine sulphate*

28  *in primary care on incident knee OA in overweight women*, Rheumatology, 56(8):1326-1334

BLOOD HURST & O'REARDON, LLP

11

00144554

BLOOD HURST & O'REARDON, LLP

1    (2017). Study participants consumed placebo or 1,500 mg daily glucosamine and periodically

2    reported knee pain, physical activity and quality of life, and had their joint space width was

3    measured by radiograph. Based on six-year analysis, de Vos and co-researchers concluded that

4    glucosamine consumption is not effective at preventing knee osteoarthritis as measured

5    according to either joint space width changes or based on symptomatic changes that included

6    impact on knee pain or joint stiffness.

7         42.     Even studies not concerning the type of glucosamine in Joint Juice demonstrate

8    that glucosamine does not provide the joint health benefits that Defendant represents. For

9    example, a study by Rozendaal et al., entitled *Effect of Glucosamine Sulfate on Hip*

10   *Osteoarthritis*, 148 Ann. of Intern. Med. 268-77 (2008), assessing the effectiveness of

11   glucosamine on the symptoms and structural progression of hip osteoarthritis during two years

12   of treatment, concluded that glucosamine was no better than placebo in reducing symptoms

13   and progression of hip osteoarthritis.

14        43.     In 2012, a report by Rovati et al. entitled *Crystalline glucosamine sulfate in the*

15   *management of knee osteoarthritis: efficacy, safety, and pharmacokinetic properties*, Ther Adv

16   Musculoskel Dis 4(3):167-180 (2012), noted that glucosamine hydrochloride "ha[s] never

17   been shown to be effective."

18        44.     On July 7, 2010, Wilkens et al. reported that there was no difference between

19   placebo and glucosamine for the treatment of low back pain and lumbar osteoarthritis and that

20   neither glucosamine nor placebo were effective in reducing pain related disability. The

21   researchers also concluded that, "Based on our results, it seems unwise to recommend

22   glucosamine to all patients" with low back pain and lumbar osteoarthritis. Wilkens et al.,

23   *Effect of Glucosamine on Pain-Related Disability in Patients With Chronic Low Back Pain*

24   *and Degenerative Lumbar Osteoarthritis*, 304(1) JAMA 45-52 (July 7, 2010).

25                  **Meta-Analyses and Scientific Review Articles**

26        45.     Well-conducted meta-analysis is at the top of the hierarchy of medical

27   evidence. *See* Reference Manual on Scientific Evidence at 607. "Meta-analysis is a method of

28

CLASS ACTION COMPLAINT

1    pooling study results to arrive at a single figure to represent the totality of the studies
2    reviewed." *Id.*

3        46.    At least eleven meta-analyses on the clinical effects of glucosamine and/or
4    chondroitin have been performed, and all ten found that the pooled results from the well-
5    conducted, non-industry studies demonstrate glucosamine, alone or in combination with
6    chondroitin, does not work. These eleven meta-analyses, which collectively reviewed the
7    results from tens of clinical studies involving thousands of people, are: Towheed, 2005
8    (20 studies, 2,570 subjects); Towheed, 2009 (25 studies, 4,963 subjects); Vlad, 2007
9    (15 studies); McAlindon, 2000 (15 studies); Eriksen, 2014 (25 studies, 3,458 subjects);
10   Wandel, 2010 (10 studies, 3,803 subjects); Reichenbach, 2007 (20 studies, 3,846 subjects);
11   Wu, 2013 (19 studies, 3,159 subjects); Singh, 2015 (43 studies, 4,962 subjects);
12   Kongtharvonskul, 2015 (31 studies); and Runhaar, 2017 (6 studies, 1,663 subjects).

13       47.    For example, in their 2007 meta-analysis, Vlad et al. reviewed all studies
14   involving glucosamine hydrochloride and concluded that "[g]lucosamine hydrochloride is not
15   effective." *Glucosamine for Pain in Osteoarthritis*, 56:7 Arthritis Rheum. 2267-77 (2007); *see*
16   *also id.* at 2275 ("we believe that there is sufficient information to conclude that glucosamine
17   hydrochloride lacks efficacy for pain in OA").

18       48.    Towheed 2009, a prestigious Cochrane Collaboration publication, reviewed
19   25 clinical studies with 4,963 subjects and found no benefits from glucosamine. *See*
20   *Glucosamine therapy for treating osteoarthritis*, Cochrane Database of Systematic Reviews
21   2005, Issue 2. Art. No.: CD002946 (Updated and Published in Issue 4, 2009). Dr. Towheed
22   and co-authors concluded, "The high quality studies showed that pain improved about the
23   same whether people took glucosamine or fake pills." *Id.* at 2.

24       49.    The 2010 meta-analysis by Wandel et al., entitled *Effects of Glucosamine,*
25   *Chondroitin, Or Placebo In Patients With Osteoarthritis Or Hip Or Knee: Network Meta-*
26   *Analysis*, BMJ 341:c4675 (2010), examined prior studies involving glucosamine and
27   chondroitin, alone or in combination, and whether they relieved the symptoms or progression
28   of arthritis of the knee or hip. The study authors reported that glucosamine and chondroitin,

BLOOD HURST & O'REARDON, LLP

13
CLASS ACTION COMPLAINT

alone or in combination, did not reduce joint pain or have an impact on the narrowing of joint space: "Our findings indicate that glucosamine, chondroitin, and their combination do not result in a relevant reduction of joint pain nor affect joint space narrowing compared with placebo." *Id.* at 8. The authors further concluded "[w]e believe it unlikely that future trials will show a clinically relevant benefit of any of the evaluated preparations." *Id.*

50.     Eriksen, 2014, is a meta-analysis published in a journal of the American College of Rheumatology. It examined 25 placebo-controlled clinical studies involving glucosamine, including GAIT, concluding "We are confident that glucosamine by and large has no clinically important effect." Eriksen, Patrick, Else M. Bartels, Roy D. Altman, Henning Bliddal, Carsten Juhl, and Robin Christensen, *Risk of Bias and Brand Explain the Observed Inconsistency in Trials on Glucosamine for Symptomatic Relief of Osteoarthritis: A Meta-Analysis of Placebo-Controlled Trials*, ARTHRITIS CARE & RESEARCH 66, no. 12 (2014) at 1844-1855; *see also id.* ("[o]ur meta-analysis provides high-quality evidence that glucosamine in forms other than the one made by Rottapharm[] consistently does not reduce pain more than placebo").

51.     In 2017, Runhaar and co-authors presented results from their meta-analysis of six glucosamine studies (examining 1,663 patients) where the original authors agreed to share their study data for critical re-analysis. Runhaar et al., Subgroup analyses of the effectiveness or oral glucosamine for knee and hip osteoarthritis: a systematic review and individual patient data meta-analysis from the OA trial bank. *Subgroup analyses of the effectiveness or oral glucosamine for knee and hip osteoarthritis: a systematic review and independent patient data meta-analysis from the OA trial bank*, Ann Rheum Dis, 76(11):1-8 (2017). Runhaar (2017) is an "individual patient data meta-analysis" or IPD, which is considered a gold standard of systematic review. The Runhaar IPD meta-analysis concluded that glucosamine has no effect on pain or physical function: "[T]he current IPD on the efficacy of glucosamine ... did not identify a subgroup for which glucosamine showed any significant beneficial effects over placebo for pain or function in either the short term or long term."

BLOOD HURST & O'REARDON, LLP

00144554

BLOOD HURST & O'REARDON, LLP

**Evidence-Based Professional Guidelines**

52.     The uniform consensus of clinical treatment protocols, sometimes referred to as clinical practice guidelines, is that glucosamine and chondroitin do not work, should not be used, and are not cost effective. Clinical treatment protocols are evidence-based, developed from an in-depth cross-review of studies and meta-analyses by experts in the field.

53.     For example, the National Collaborating Centre for Chronic Conditions ("NCCCC") reported "the evidence to support the efficacy of glucosamine hydrochloride as a symptom modifier is poor" and the "evidence for efficacy of chondroitin was less convincing." NCCCC, *Osteoarthritis National Clinical Guideline for Care and Management of Adults*, Royal College of Physicians, London 2008. Consistent with its lack of efficacy findings, the NCCCC Guideline did not recommend the use of glucosamine or chondroitin for treating osteoarthritis. *Id.* at 33.

54.     In December 2008, the American Academy of Orthopaedic Surgeons ("AAOS") published clinical practice guidelines for the *Treatment of osteoarthritis of the knee (nonarthroplasty)*, and made a "strong" recommendation that "glucosamine and sulfate or hydrochloride not be prescribed for patients with symptomatic OA of the knee." Richmond et al., *Treatment of osteoarthritis of the knee (nonarthroplasty)*, J. Am. Acad. Orthop. Surg. Vol. 17 No. 9 591-600 (2009). This AAOS recommendation was based on a 2007 report from the Agency for Healthcare Research and Quality (AHRQ), which states that "the best available evidence found that glucosamine hydrochloride, chondroitin sulfate, or their combination did not have any clinical benefit in patients with primary OA of the knee." Samson et al., *Treatment of Primary and Secondary Osteoarthritis of the Knee, Agency for Healthcare Research and Quality*, 2007 Sep. 1. Report No. 157.

55.     In 2009, a panel of scientists from the European Food Safety Authority ("EFSA") (a panel established by the European Union to provide independent scientific advice to improve food safety and consumer protection), reviewed nineteen studies submitted by an applicant, and concluded that "a cause and effect relationship has not been established between the consumption of glucosamine hydrochloride and a reduced rate of cartilage degeneration in

00144554

BLOOD HURST & O'REARDON, LLP

individuals without osteoarthritis." EFSA Panel on Dietetic Products, Nutrition and Allergies, *Scientific Opinion on the substantiation of a health claim related to glucosamine hydrochloride and reduced rate of cartilage degeneration and reduced risk of osteoarthritis*, EFSA Journal (2009), 7(10):1358.

56.     In a separate opinion from 2009, an EFSA panel examined the evidence for glucosamine (either hydrochloride or sulfate) alone or in combination with chondroitin sulfate and maintenance of joints. The claimed effect was "joint health," and the proposed claims included "helps to maintain healthy joint," "supports mobility," and "helps to keep joints supple and flexible." Based on its review of eleven human intervention studies, three meta-analyses, 21 reviews and background papers, two animal studies, one in vitro study, one short report, and one case report, the EFSA panel concluded that "a cause and effect relationship has not been established between the consumption of glucosamine (either as glucosamine hydrochloride or as glucosamine sulphate), either alone or in combination with chondroitin sulphate, and the maintenance of normal joints." EFSA Panel on Dietetic Products, Nutrition and Allergies, *Scientific Opinion on the substantiation of health claims related to glucosamine alone or in combination with chondroitin sulphate and maintenance of joints and reduction of inflammation*, EFSA Journal (2009), 7(9):1264.

57.     In 2012, EFSA examined the evidence glucosamine sulphate or glucosamine hydrochloride, and a claimed effect of "contributes to the maintenance of normal joint cartilage." Based on its review of 61 references provided by Merck Consumer Healthcare, the EFSA panel concluded that "a cause and effect relationship has not been established between the consumption of glucosamine and maintenance of normal joint cartilage in individuals without osteoarthritis." EFSA Panel on Dietetic Products, Nutrition and Allergies, *Scientific Opinion on the substantiation of a health claim related to glucosamine and maintenance of normal joint cartilage*, EFSA Journal 2012, 10(5): 2691.

58.     In 2013, the AAOS published updated clinical practice guidelines, and based on its review of twenty-one human studies, again made a "strong" recommendation that neither glucosamine nor chondroitin be used for patients with symptomatic osteoarthritis of the knee.

*See* Treatment of Osteoarthritis of the Knee, Evidence-Based Guideline (2d Ed.), American Academy of Orthopaedic Surgeons (2013) at 262.

59.    The American College of Rheumatology ("ACR"), and the United Kingdom National Institute for Health and Care Excellence ("NICE") also recommend against using glucosamine or chondroitin. *See* Hochberg, M.C. et al., American College of Rheumatology 2012 *Recommendations for the Use of Nonpharmacologic and Pharmacologic Therapies in Osteoarthritis of the Hand, Hip, and Knee.* Arthritis Care & Research 2012; 64(4):465-474; National Institute for Health and Care Excellence, Clinical Guidelines: Osteoarthritis Care and management in adults (February 2014).

60.    The AAOS, ACR, NICE and AHRQ guidelines were based on systematic reviews and/or meta-analyses of all the available study data. For example, the ACR specifically cited its reliance on the GAIT study coupled with four meta-analyses that "failed to demonstrate clinically important efficacy for these agents": Towheed (2005); Vlad (2007); Reichenbach (2007); and Wandel (2010). The NICE authors' conclusion that practitioners should "not offer glucosamine or chondroitin products" was based on a review that included Towheed (2005), which included 25 glucosamine RCTs, Reichenbach (2007), which included 20 chondroitin RCTs, and seven studies that compared glucosamine plus chondroitin versus placebo. The 2007 AHRQ assessment was based on review of 21 glucosamine/chondroitin studies, including GAIT. The AAOS' 2013 "strong" recommendation against glucosamine and chondroitin was based on expert analysis and meta-analyses of 12 glucosamine studies, 8 chondroitin studies, and one study (GAIT) that assessed both.

***The Impact of Defendant's Wrongful Conduct***

61.    Despite clinical studies that show the ingredients in Joint Juice are ineffective, Defendant conveyed and continues to convey one uniform health benefits message: Joint Juice supports and nourishes cartilage, "lubricates" joints, and improves joint comfort in all joints in the human body, for adults of all ages and for all manner and stages of joint-related ailments.

62.    As the inventor, manufacturer, and distributor of Joint Juice, Defendant possesses specialized knowledge regarding the content and effects of the ingredients contained

BLOOD HURST & O'REARDON, LLP

00144554

BLOOD HURST & O'REARDON, LLP

1    in Joint Juice and Defendant is in a superior position to know whether Joint Juice works as

2    advertised.

3        63.    Specifically, Defendant knew, but failed to disclose, that Joint Juice does not

4    provide the joint health benefits represented and that well-conducted, clinical studies have

5    found the ingredients in Joint Juice to be ineffective in providing the joint health benefits

6    represented by Defendant.

7        64.    Plaintiff has been and will continue to be deceived or misled by Defendant's

8    false and deceptive joint health benefit representations. Plaintiff purchased Joint Juice during

9    the Class period and in doing so, read and considered Joint Juice's label and based her decision

10   to purchase Joint Juice on the joint health benefit representations on Joint Juice's labeling.

11   Defendant's joint health benefit representations and omissions were a material factor in

12   influencing Plaintiff's decision to purchase Joint Juice.

13       65.    The only purpose for purchasing Joint Juice is to obtain the represented joint

14   health benefits. Although it does not provide the represented, significant health benefits, Joint

15   Juice retails for approximately $9 per six-pack.[5]

16                      **CLASS DEFINITION AND ALLEGATIONS**

17       66.    Plaintiff brings this action on behalf of herself and all others similarly situated

18   pursuant to Civil Code § 1781, and seeks certification of the following Class:

19           All persons who purchased in California any Joint Juice product
20           between June 21, 2016 and the date notice is disseminated.

21       67.    Excluded from the Class are the Defendant, its parents, subsidiaries, affiliates,

22   officers, and directors; those who purchased Joint Juice for the purpose of resale; all persons

23   who make a timely election to be excluded from the Class; the judge to whom this case is

24   assigned and any immediate family members thereof; and those who assert claims for personal

25   injury.

26   _____
     [5]    At Walmart's online store, a six-pack of 8-ounce bottles costs $10.13.
27   https://www.walmart.com/ip/Joint-Juice-Glucosamine-Chondroitin-Blend-Blueberry-Acai-4-
     6pk-8oz/14292593 (last visited January 15, 2019); *see also* http://shop.jointjuice.com/Joint-
28   Juice-ReadytoDrink-Supplement--Blueberry-Acai/p/JTJ-042203&c=JointJuice@Drinks    (6-
     pack of 8-ounce bottles retails for $8.94 on jointjuice.com) (last visited January 15, 2019).

BLOOD HURST & O'REARDON, LLP

68.    Certification of Plaintiff's claims for classwide treatment is appropriate because Plaintiff can prove the elements of her claims on a classwide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claims.

69.    Members of the Class are so numerous and geographically dispersed that joinder of all class members is impracticable. Plaintiff is informed and believes, and on that basis alleges, that the proposed Class contains many thousands of members. The precise number of Class members is unknown to Plaintiff but is believed to be in the thousands.

70.    Common questions of law and fact exist as to all members of the Class and predominate over questions affecting only individual Class members. The common legal and factual questions include, but are not limited to, the following:

    (a)    Whether the representations discussed herein that Defendant made about its Joint Juice products were or are true, misleading, or likely to deceive;

    (b)    Whether Defendant's conduct violates public policy;

    (c)    Whether Defendant engaged in false or misleading advertising;

    (d)    Whether Defendant's conduct constitutes violations of the laws asserted herein;

    (e)    Whether Plaintiff and the other Class members have been injured, and the proper measure of their losses as a result of those injuries; and

    (f)    Whether Plaintiff and the other Class members are entitled to injunctive, declaratory, or other equitable relief.

71.    The claims asserted by Plaintiff in this action are typical of the claims of the members of the Class, as the claims arise from the same course of conduct by Defendant, and the relief sought is common. Plaintiff and Class members suffered uniform damages caused by their purchase of the Joint Juice products marketed and sold by Defendant.

72.    Plaintiff will fairly and adequately represent and protect the interests of the members of the Class. Plaintiff has retained counsel competent and experienced in both consumer protection and class litigation.

00144554

73.     A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The damages or other financial detriment suffered by Plaintiff and the other Class members are relatively small compared to the burden and expense that would be required to individually litigate their claims against Defendant, so it would be impracticable for Class members to individually seek redress for Defendant's wrongful conduct. Even if Class members could afford individual litigation, the court system could not. Individualized litigation creates a potential for inconsistent or contradictory judgments, and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties, and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

74.     In the alternative, the Class also may be certified because Defendant has acted or refused to act on grounds generally applicable to the Class thereby making final declaratory and/or injunctive relief with respect to the members of the Class as a whole, appropriate.

75.     Plaintiff seeks preliminary and permanent injunctive and equitable relief on behalf of the Class, on grounds generally applicable to the Class, to enjoin and prevent Defendant from engaging in the acts described, and to require Defendant to provide full restitution to Plaintiff and Class members.

76.     Unless the Class is certified, Defendant will retain monies that were taken from Plaintiff and Class members as a result of Defendant's wrongful conduct. Unless a classwide injunction is issued, Defendant will continue to commit the violations alleged and the members of the Class and the general public will continue to be misled.

## CLAIMS ALLEGED

## COUNT I

## Violation of Business & Professions Code §§ 17200, *et seq.*

77.     Plaintiff incorporates the preceding paragraphs as if fully set forth herein.

78.     As alleged herein, Plaintiff has suffered injury in fact and lost money or property as a result of Defendant's conduct because she purchased one of Defendant's falsely

BLOOD HURST & O'REARDON, LLP

00144554

BLOOD HURST & O'REARDON, LLP

1   advertised Joint Juice products in reliance on the false advertisements.

2   79.   The Unfair Competition Law, Business & Professions Code §§ 17200, *et seq.*

3   ("UCL"), and similar laws in other states, prohibits any "unlawful," "fraudulent" or "unfair"

4   business act or practice and any false or misleading advertising. In the course of conducting

5   business, Defendant committed unlawful business practices by, among other things, making

6   the representations (which also constitutes advertising within the meaning of § 17200) and

7   omissions of material facts, as set forth more fully herein, and violating Civil Code §§ 1572,

8   1573, 1709, 1711, 1770(a)(5), (7), (9) and (16) and Business & Professions Code §§ 17200, *et*

9   *seq.*, 17500, *et seq.*, and the common law.

10   80.   Plaintiff, individually and on behalf of the other Class members, reserves the

11   right to allege other violations of law, which constitute other unlawful business acts or

12   practices. Such conduct is ongoing and continues to this date.

13   81.   In the course of conducting business, Defendant committed "unfair" business

14   practices by, among other things, making the representations (which also constitute advertising

15   within the meaning of § 17200) and omissions of material facts regarding Joint Juice in its

16   advertising campaign, including Joint Juice's packaging and labeling, as set forth more fully

17   herein. There is no societal benefit from false advertising – only harm. Plaintiff and the other

18   Class members paid for a valueless product that does not confer the benefits it promises. While

19   Plaintiff and the other Class members were harmed, Defendant was unjustly enriched by its

20   false misrepresentations and omissions. As a result, Defendant's conduct is "unfair," as it

21   offended an established public policy. Further, Defendant engaged in immoral, unethical,

22   oppressive, and unscrupulous activities that are substantially injurious to consumers.

23   82.   Further, as set forth in this Complaint, Plaintiff alleges violations of consumer

24   protection, unfair competition, and truth in advertising laws in California and other states,

25   resulting in harm to consumers. Defendant's acts and omissions also violate and offend the

26   public policy against engaging in false and misleading advertising, unfair competition, and

27   deceptive conduct towards consumers. This conduct constitutes violations of the unfair prong

28   of Business & Professions Code §§ 17200, *et seq.*

BLOOD HURST & O'REARDON, LLP

83.     There were reasonably available alternatives to further Defendant's legitimate business interests, other than the conduct described herein. Business & Professions Code §§ 17200, *et seq.*, also prohibits any "fraudulent business act or practice." In the course of conducting business, Defendant committed "fraudulent business act or practices" by, among other things, making the representations (which also constitute advertising within the meaning of § 17200) and omissions of material facts regarding Joint Juice in its advertising campaign, including on Joint Juice's packaging and labeling, as set forth more fully herein. Defendant made the misrepresentations and omissions regarding the efficacy of Joint Juice, among other ways, by misrepresenting on each and every Joint Juice product's packaging and labeling that Joint Juice is effective when taken as directed, when, in fact, the representations are false and deceptive, and Joint Juice does not confer the promised health benefits.

84.     Defendant's actions, claims, omissions, and misleading statements, as more fully set forth above, were also false, misleading and/or likely to deceive the consuming public within the meaning of Business & Professions Code §§ 17200, *et seq.*

85.     Plaintiff and the other members of the Class have in fact been deceived as a result of their reliance on Defendant's material representations and omissions, which are described above. This reliance has caused harm to Plaintiff and the other members of the Class, each of whom purchased Defendant's Joint Juice products. Plaintiff and the other Class members have suffered injury in fact and lost money as a result of purchasing Joint Juice and Defendant's unlawful, unfair, and fraudulent practices.

86.     Defendant knew, or should have known, that its material representations and omissions would be likely to deceive the consuming public and result in consumers purchasing Joint Juice products and, indeed, intended to deceive consumers.

87.     As a result of its deception, Defendant has been able to reap unjust revenue and profit.

88.     Unless restrained and enjoined, Defendant will continue to engage in the above-described conduct. Accordingly, injunctive relief is appropriate.

89.     Plaintiff, on behalf of herself, all others similarly situated, and the general public, seeks restitution from Defendant of all money obtained from Plaintiff and the other members of the Class collected as a result of unfair competition, an injunction prohibiting Defendant from continuing such practices, corrective advertising, and all other relief this Court deems appropriate, consistent with Business & Professions Code § 17203.

## COUNT II

### Violation of the Consumers Legal Remedies Act – Civil Code §§ 1750, *et seq.*

90.     Plaintiff incorporates the preceding paragraphs as if fully set forth herein.

91.     This cause of action is brought pursuant to the Consumers Legal Remedies Act, California Civil Code §§ 1750, *et seq.* (the "Act") and similar laws in other states. Plaintiff is a consumer as defined by California Civil Code § 1761(d). Joint Juice is a "good" within the meaning of the Act.

92.     Defendant violated and continues to violate the Act by engaging in the following practices proscribed by California Civil Code § 1770(a) in transactions with Plaintiff and the Class which were intended to result in, and did result in, the sale of its Joint Juice products:

(5)     Representing that [Joint Juice has] . . . approval, characteristics, . . . uses [and] benefits . . . which [it does] not have . . . .

\*          \*          \*

(7)     Representing that [Joint Juice is] of a particular standard, quality or grade . . . if [it is] of another.

\*          \*          \*

(9)     Advertising goods . . . with intent not to sell them as advertised.

\*          \*          \*

(16)    Representing that [Joint Juice has] been supplied in accordance with a previous representation when [it has] not.

///

///

BLOOD HURST & O'REARDON, LLP

00144554

BLOOD HURST & O'REARDON, LLP

93.     Defendant violated the Act by representing and failing to disclose material facts on its Joint Juice products' labeling and associated advertising, as described above, when it knew, or should have known, that the representations were false and misleading and that the omissions were of material facts they were obligated to disclose.

94.     Pursuant to California Civil Code § 1782(d), Plaintiff, individually and on behalf of the other members of the Class, seeks a Court order enjoining the above-described wrongful acts and practices of Defendant and for restitution and disgorgement.

95.     Pursuant to § 1782 of the Act, Plaintiff notified Defendant in writing by certified mail of the particular violations of § 1770 of the Act and demanded that Defendant rectify the problems associated with the actions detailed above and give notice to all affected consumers of Defendant's intent to so act. A copy of the letter is attached hereto as Exhibit A.

96.     If Defendant fails to rectify or agree to rectify the problems associated with the actions detailed above and give notice to all affected consumers within 30 days of the date of written notice pursuant to § 1782 of the Act, Plaintiff will amend this complaint to add claims for actual, punitive and statutory damages, as appropriate.

97.     Defendant's conduct is fraudulent, wanton, and malicious.

98.     Pursuant to § 1780(d) of the Act, attached hereto as Exhibit B is the affidavit showing that this action has been commenced in the proper forum.

## COUNT III

### Unjust Enrichment

99.     Plaintiff incorporates the preceding paragraphs as if fully set forth herein.

100.    Defendant has been unjustly enriched to Plaintiff's and the Class members' detriment as a result of its unlawful and wrongful retention of money conferred by Plaintiff and the Class members, such that Defendant's retention of their money would be inequitable.

101.    Defendant's unlawful and wrongful acts, as alleged above, enabled Defendant to unlawfully receive monies it would not have otherwise obtained.

///

///

00144554

BLOOD HURST & O'REARDON, LLP

102.    Plaintiff and the Class members have conferred benefits on Defendant, which Defendant has knowingly accepted and retained.

103.    Defendant's retention of the benefits conferred by Plaintiff and the Class members would be against fundamental principles of justice, equity, and good conscience.

104.    Plaintiff and the Class members seek to disgorge Defendant's unlawfully retained profits and other benefits resulting from its unlawful conduct, and seek restitution and rescission for the benefit of Plaintiff and the Class members.

105.    Plaintiff and the Class members are entitled to the imposition of a constructive trust upon Defendant, such that its unjustly retained profits and other benefits are distributed equitably by the Court to and for the benefit of Plaintiff and the Class members.

**JURY DEMAND**

Plaintiff demands trial by jury of all claims in this Complaint so triable.

**REQUEST FOR RELIEF**

WHEREFORE, Plaintiff, individually and on behalf of the other members of the Class, respectfully request that the Court enter judgment in their favor and against Defendant, as follows:

A.    Declaring Certifying the class as requested herein;

B.    Awarding plaintiff and the proposed Class members actual and punitive damages;

C.    Awarding restitution and disgorgement of Defendant's revenues to plaintiff and the proposed Class members;

D.    Awarding declaratory and injunctive relief as permitted by law or equity, including enjoining Defendant from continuing the unlawful practices as set forth herein, and directing Defendant to identify, with court supervision, victims of its conduct and pay them restitution and disgorgement of all monies acquired by Defendant by means of any act or practice declared by this Court to be wrongful;

E.    Ordering Defendant to engage in a corrective advertising campaign;

///

1     F.     Awarding attorneys' fees and costs; and

2     G.     Providing such further relief as may be just and proper.

3                Respectfully submitted,

Dated: January 15, 2019

BLOOD HURST & O'REARDON, LLP
TIMOTHY G. BLOOD (149343)
LESLIE E. HURST (178432)
THOMAS J. O'REARDON II (247952)
PAULA R. BROWN (254142)

By: TIMOTHY G. BLOOD

501 West Broadway, Suite 1490
San Diego, CA 92101
Tel: 619/338-1100
619/338-1101 (fax)
tblood@bholaw.com
lhurst@bholaw.com
toreardon@bholaw.com
pbrown@bholaw.com

ALTAIR LAW
CRAIG M. PETERS (184018)
369 Pine St., Suite 600
San Francisco, CA 94104
Tel: 415/988-9828
cpeters@altairlaw.us

CARLSON LYNCH SWEET KILPELA
   & CARPENTER, LLP
TODD D. CARPENTER (234464)
1350 Columbia Street, Suite 603
San Diego, CA 92101
Tel: 619/347-3517
619/756-6991 (fax)
tcarpenter@carlsonlynch.com

*Attorneys for Plaintiff*

00144554

BLOOD HURST & O'REARDON, LLP

Attachment (Exhibit A) to Class Action Complaint
CLRA Letter

 

BLOOD
HURST &
O'REARDON | LLP

Timothy G. Blood
tblood@bholaw.com

January 15, 2019

<u>VIA CERTIFIED MAIL (RETURN RECEIPT)</u>
(RECEIPT NO. 7018 0040 0000 8346 5020)

Mrs. Darcy Horn Davenport, President
Premier Nutrition Corporation
1222 67th Street, Suite 210
Emeryville, CA 94608

     Re:    Joint Juice®

Dear Mrs. Davenport:

We represent Patricia Bland ("Plaintiff") and all other similarly situated California consumers in an action against Premier Nutrition Corporation ("Premier" or "defendant"), arising out of, *inter alia*, misrepresentations by Premier to consumers that its Joint Juice® products provide consumers with joint health benefits, including supporting and nourishing cartilage, lubricating joints, decreasing joint pain, and helping with joint comfort.

Plaintiff and others similarly situated purchased Joint Juice unaware of the fact that defendant's representations were deceptive and not truthful, including because numerous, well-designed and well-conducted scientific studies have been conducted and demonstrate that Joint Juice does not provide the purported major joint health benefits to all persons. The full claims, including the facts and circumstances surrounding these claims, are detailed in the Class Action Complaint, a copy of which is attached and incorporated by this reference.

These representations and omissions are false and misleading and constitute unfair methods of competition and unlawful, unfair, and fraudulent acts or practices, undertaken by defendant with the intent to result in the sale of Joint Juice to the consuming public.

Defendant's practices constitute violations of the Consumers Legal Remedies Act, California Civil Code §§1750, *et seq.* Specifically, defendant's practices violate California Civil Code §1770(a) under, *inter alia*, the following subdivisions:

(5)    Representing that goods or services have . . .approval, characteristics, . . . uses [or] benefits . . . which they do not have . . . .

* * *

(7)    Representing that goods or services are of a particular standard, quality or grade . . . if they are of another.

* * *

00145066



Mrs. Darcy Horn Davenport
January 15, 2019
Page 2

(9)    Advertising goods or services with intent not to sell them as advertised.

* * *

(16)    Representing that the subject of a transaction has been supplied in accordance with a previous representation when it has not.

As detailed in the attached Complaint, defendant's practices also violate California Business and Professions Code §§17200, *et seq.*, and constitute a breach of warranty and unjust enrichment.

While the Complaint constitutes sufficient notice of the claims asserted, pursuant to California Civil Code §1782 and California Commercial Code §2607, we hereby demand on behalf of our client and all others similarly situated California consumers that defendant immediately correct and rectify these violations by ceasing the misleading marketing campaign, ceasing dissemination of false and misleading information as described in the enclosed Complaint, and initiating a corrective advertising campaign to re-educate consumers regarding the truth of the products at issue. In addition, Premier must offer to refund the purchase price to all California consumer purchasers of Joint Juice, plus provide reimbursement for interest, costs, and fees.

We await your response.

Sincerely,

TIMOTHY G. BLOOD

TGB:jk

Enclosure

00145066

Attachment (Exhibit B) to Class Action Complaint
Affidavit of T. Blood Pursuant to Cal. Civ. Code § 1780(d)

BLOOD HURST & O'REARDON, LLP

1  BLOOD HURST & O'REARDON, LLP
   TIMOTHY G. BLOOD (149343)
2  LESLIE E. HURST (178432)
   THOMAS J. O'REARDON II (247952)
3  PAULA R. BROWN (254142)
   501 West Broadway, Suite 1490
4  San Diego, CA  92101
   Tel: 619/338-1100
5  619/338-1101 (fax)
   tblood@bholaw.com
6  lhurst@bholaw.com
   toreardon@bholaw.com
7  pbrown@bholaw.com

8  Attorneys for Plaintiff

9

10         **SUPERIOR COURT OF THE STATE OF CALIFORNIA**

11       **FOR THE COUNTY OF ALAMEDA – NORTHERN DIVISION**

12  | PATRICIA BLAND, individually and on | Case No. |
    behalf of all others similarly situated,

13                                          **CLASS ACTION**
                Plaintiff,
14                                          **AFFIDAVIT OF TIMOTHY G. BLOOD**
           v.                               **PURSUANT TO CALIFORNIA CIVIL**
15                                          **CODE § 1780(d)**
    PREMIER NUTRITION
16  CORPORATION; and DOES 1-25,
    inclusive,                              (*UNLIMITED MATTER*-Amount demanded
17                                          exceeds $25,000)
                Defendant.
18                                          **DEMAND FOR JURY TRIAL**

19

20

21

22

23

24

25

26

27

28

00145065

AFFIDAVIT PURSUANT TO CAL. CIV. CODE § 1780(d)

1    I, TIMOTHY G. BLOOD, declare as follows:

2    1.    I am an attorney duly licensed to practice before all of the courts of the State of

3  California. I am the managing partner of the law firm of Blood Hurst & O'Reardon, LLP, one

4  of the counsel of record for plaintiff in the above-entitled action.

5    2.    Defendant Premier Nutrition Corporation has done and is doing business in

6  Alameda County. Such business includes the development, marketing and sale of its Joint

7  Juice products. Furthermore, Defendant maintains its headquarters in Alameda County.

8    I declare under penalty of perjury under the laws of the State of California that the

9  foregoing is true and correct. Executed this 15th day of January 2019, at San Diego,

10  California.

11

12                                          TIMOTHY G. BLOOD

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

BLOOD HURST & O'REARDON, LLP

00145065

JAN/15/2019/TUE 02:18 PM                    FAX No.                      P. 036/040

CM-010

| **ATTORNEY OR PARTY WITHOUT ATTORNEY** *(Name, State Bar number, and address):* | **FOR COURT USE ONLY** |
|---|---|
| Timothy G. Blood (149343)   [See Attachment for List of All Counsel]<br>Blood Hurst & O'Reardon, LLP<br>501 West Broadway, Suite 1490<br>San Diego, CA 92101<br>TELEPHONE NO.: 619/338-1100   FAX NO.: 619/338-1101<br>ATTORNEY FOR *(Name):* Plaintiff Patricia Bland | **FILED BY FAX**<br>ALAMEDA COUNTY<br>January 15, 2019<br>CLERK OF<br>THE SUPERIOR COURT<br>By Cheryl Clark, Deputy |

**SUPERIOR COURT OF CALIFORNIA, COUNTY OF** Alameda
STREET ADDRESS: 1225 Fallon Street
MAILING ADDRESS:
CITY AND ZIP CODE: Oakland 94612
BRANCH NAME: Rene C. Davidson Courthouse - Northern Division

**CASE NAME:**
Patricia Bland v. Premier Nutrition Corporation

| **CIVIL CASE COVER SHEET** | **Complex Case Designation** | CASE NUMBER: RG19002714 |
|---|---|---|
| ☑ Unlimited  ☐ Limited<br>(Amount        (Amount<br>demanded     demanded is<br>exceeds $25,000)  $25,000 or less) | ☐ Counter  ☐ Joinder<br>Filed with first appearance by defendant<br>(Cal. Rules of Court, rule 3.402) | JUDGE:<br>DEPT: |

*Items 1–6 below must be completed (see instructions on page 2).*

1. Check one box below for the case type that best describes this case:

| **Auto Tort** | **Contract** | **Provisionally Complex Civil Litigation** (Cal. Rules of Court, rules 3.400–3.403) |
|---|---|---|
| ☐ Auto (22) | ☐ Breach of contract/warranty (06) | ☐ Antitrust/Trade regulation (03) |
| ☐ Uninsured motorist (46) | ☐ Rule 3.740 collections (09) | ☐ Construction defect (10) |
| **Other PI/PD/WD (Personal Injury/Property Damage/Wrongful Death) Tort** | ☐ Other collections (09) | ☐ Mass tort (40) |
| ☐ Asbestos (04) | ☐ Insurance coverage (18) | ☐ Securities litigation (28) |
| ☐ Product liability (24) | ☐ Other contract (37) | ☐ Environmental/Toxic tort (30) |
| ☐ Medical malpractice (45) | **Real Property** | ☐ Insurance coverage claims arising from the above listed provisionally complex case types (41) |
| ☐ Other PI/PD/WD (23) | ☐ Eminent domain/Inverse condemnation (14) | |
| **Non-PI/PD/WD (Other) Tort** | ☐ Wrongful eviction (33) | **Enforcement of Judgment** |
| ☐ Business tort/unfair business practice (07) | ☐ Other real property (26) | ☐ Enforcement of judgment (20) |
| ☐ Civil rights (08) | **Unlawful Detainer** | **Miscellaneous Civil Complaint** |
| ☐ Defamation (13) | ☐ Commercial (31) | ☐ RICO (27) |
| ☐ Fraud (16) | ☐ Residential (32) | ☑ Other complaint *(not specified above)* (42) |
| ☐ Intellectual property (19) | ☐ Drugs (38) | **Miscellaneous Civil Petition** |
| ☐ Professional negligence (25) | **Judicial Review** | ☐ Partnership and corporate governance (21) |
| ☐ Other non-PI/PD/WD tort (35) | ☐ Asset forfeiture (05) | ☐ Other petition *(not specified above)* (43) |
| **Employment** | ☐ Petition re: arbitration award (11) | |
| ☐ Wrongful termination (36) | ☐ Writ of mandate (02) | |
| ☐ Other employment (15) | ☐ Other judicial review (39) | |

2. This case ☑ is  ☐ is not  complex under rule 3.400 of the California Rules of Court. If the case is complex, mark the factors requiring exceptional judicial management:
   a. ☐ Large number of separately represented parties   d. ☑ Large number of witnesses
   b. ☐ Extensive motion practice raising difficult or novel issues that will be time-consuming to resolve   e. ☐ Coordination with related actions pending in one or more courts in other counties, states, or countries, or in a federal court
   c. ☑ Substantial amount of documentary evidence   f. ☐ Substantial postjudgment judicial supervision

3. Remedies sought *(check all that apply):* a. ☑ monetary  b. ☑ nonmonetary; declaratory or injunctive relief  c. ☑ punitive
4. Number of causes of action *(specify):* 3: violation of Civ. Code §1750, B&P Code §17200; and Unjust Enrichment
5. This case ☑ is  ☐ is not  a class action suit.
6. If there are any known related cases, file and serve a notice of related case. *(You may use form CM-015.)*

Date: January 15, 2019
Timothy G. Blood
_____   _____
(TYPE OR PRINT NAME)                        (SIGNATURE OF PARTY OR ATTORNEY FOR PARTY)

**NOTICE**
- Plaintiff must file this cover sheet with the first paper filed in the action or proceeding (except small claims cases or cases filed under the Probate Code, Family Code, or Welfare and Institutions Code). (Cal. Rules of Court, rule 3.220.) Failure to file may result in sanctions.
- File this cover sheet in addition to any cover sheet required by local court rule.
- If this case is complex under rule 3.400 et seq. of the California Rules of Court, you must serve a copy of this cover sheet on all other parties to the action or proceeding.
- Unless this is a collections case under rule 3.740 or a complex case, this cover sheet will be used for statistical purposes only.

Page 1 of 2

Form Adopted for Mandatory Use
Judicial Council of California
CM-010 [Rev. July 1, 2007]
CIVIL CASE COVER SHEET
Cal. Rules of Court, rules 2.30, 3.220, 3.400–3.403, 3.740;
Cal. Standards of Judicial Administration, std. 3.10
www.courtinfo.ca.gov

*Unified Rules of the Superior Court of California, County of Alameda*

F. ADDENDUM TO CIVIL CASE COVER SHEET

| Short Title: | Case Number: |
|---|---|
| Bland v. Premier Nutrition Corporation | |

**CIVIL CASE COVER SHEET ADDENDUM**

**THIS FORM IS REQUIRED IN ALL NEW <u>UNLIMITED</u> CIVIL CASE FILINGS IN THE SUPERIOR COURT OF CALIFORNIA, COUNTY OF ALAMEDA**

[X] Oakland, Rene C. Davidson Alameda County Courthouse (446)   [ ] Hayward Hall of Justice (447)
[ ] Pleasanton, Gale-Schenone Hall of Justice (448)

| Civil Case Cover Sheet Category | Civil Case Cover Sheet Case Type | Alameda County Case Type (check only one) | | |
|---|---|---|---|---|
| Auto Tort | Auto tort (22) | [ ] | 34 | Auto tort (G) |
| | | | | Is this an uninsured motorist case? [ ] yes [ ] no |
| Other PI /PD / WD Tort | Asbestos (04) | [ ] | 75 | Asbestos (D) |
| | Product liability (24) | [ ] | 89 | Product liability (<u>not</u> asbestos or toxic tort/environmental) (G) |
| | Medical malpractice (45) | [ ] | 97 | Medical malpractice (G) |
| | Other PI/PD/WD tort (23) | [ ] | 33 | Other PI/PD/WD tort (G) |
| Non - PI /PD / WD Tort | Bus tort / unfair bus. practice (07) | [ ] | 79 | Bus tort / unfair bus. practice (G) |
| | Civil rights (08) | [ ] | 80 | Civil rights (G) |
| | Defamation (13) | [ ] | 84 | Defamation (G) |
| | Fraud (16) | [ ] | 24 | Fraud (G) |
| | Intellectual property (19) | [ ] | 87 | Intellectual property (G) |
| | Professional negligence (25) | [ ] | 59 | Professional negligence - non-medical (G) |
| | Other non-PI/PD/WD tort (35) | [ ] | 03 | Other non-PI/PD/WD tort (G) |
| Employment | Wrongful termination (36) | [ ] | 38 | Wrongful termination (G) |
| | Other employment (15) | [ ] | 85 | Other employment (G) |
| | | [ ] | 53 | Labor comm award confirmation |
| | | [ ] | 54 | Notice of appeal - L.C.A. |
| Contract | Breach contract / Wrnty (06) | [ ] | 04 | Breach contract / Wrnty (G) |
| | Collections (09) | [ ] | 81 | Collections (G) |
| | Insurance coverage (18) | [ ] | 86 | Ins. coverage - non-complex (G) |
| | Other contract (37) | [ ] | 98 | Other contract (G) |
| Real Property | Eminent domain / Inv Cdm (14) | [ ] | 18 | Eminent domain / Inv Cdm (G) |
| | Wrongful eviction (33) | [ ] | 17 | Wrongful eviction (G) |
| | Other real property (26) | [ ] | 36 | Other real property (G) |
| Unlawful Detainer | Commercial (31) | [ ] | 94 | Unlawful Detainer - commercial   Is the deft. in possession |
| | Residential (32) | [ ] | 47 | Unlawful Detainer - residential   of the property? |
| | Drugs (38) | [ ] | 21 | Unlawful detainer - drugs   [ ] Yes   [ ] No |
| Judicial Review | Asset forfeiture (05) | [ ] | 41 | Asset forfeiture |
| | Petition re: arbitration award (11) | [ ] | 62 | Pet. re: arbitration award |
| | Writ of Mandate (02) | [ ] | 49 | Writ of mandate |
| | | | | Is this a CEQA action (Publ.Res.Code section 21000 et seq) [ ] Yes [ ] No |
| | Other judicial review (39) | [ ] | 64 | Other judicial review |
| Provisionally Complex | Antitrust / Trade regulation (03) | [ ] | 77 | Antitrust / Trade regulation |
| | Construction defect (10) | [ ] | 82 | Construction defect |
| | Claims involving mass tort (40) | [ ] | 78 | Claims involving mass tort |
| | Securities litigation (28) | [ ] | 91 | Securities litigation |
| | Toxic tort / Environmental (30) | [ ] | 93 | Toxic tort / Environmental |
| | Ins covrg from cmplx case type (41) | [ ] | 95 | Ins covrg from complex case type |
| Enforcement of Judgment | Enforcement of judgment (20) | [ ] | 19 | Enforcement of judgment |
| | | [ ] | 08 | Confession of judgment |
| Misc Complaint | RICO (27) | [ ] | 90 | RICO (G) |
| | Partnership / Corp. governance (21) | [ ] | 88 | Partnership / Corp. governance (G) |
| | Other complaint (42) | [X] | 68 | All other complaints (G) |
| Misc. Civil Petition | Other petition (43) | [ ] | 06 | Change of name |
| | | [ ] | 69 | Other petition |

*Patricia Bland v. Premier Nutrition Corporation*

Alameda County Superior Court – Rene C. Davidson Courthouse

**ATTACHMENT TO CIVIL CASE COVER SHEET**

*Attorneys for Plaintiff Patricia Bland*

BLOOD HURST & O'REARDON LLP
Timothy G. Blood (149343)
Leslie E. Hurst (178432)
Thomas J. O'Reardon II (247952)
Paula R. Brown (254142)
501 West Broadway, Suite 1490
San Diego, CA  92101
Tel: 619/338-1100
619/338-1101 (fax)
tblood@bholaw.com
lhurst@bholaw.com
toreardon@bholaw.com
pbrown@bholaw.com

ALTAIR LAW
Craig M. Peters (184018)
369 Pine St., Suite 600
San Francisco, CA  94104
Tel: 415/988-9828
cpeters@altairlaw.us

CARLSON LYNCH SWEET KILPELA
   & CARPENTER, LLP
Todd D. Carpenter (234464)
1350 Columbia Street, Suite 603
San Diego, CA  92101
Tel: 619/347-3517
619/756-6991 (fax)
tcarpenter@carlsonlynch.com

00144893

CM-010

## INSTRUCTIONS ON HOW TO COMPLETE THE COVER SHEET

**To Plaintiffs and Others Filing First Papers.** If you are filing a first paper (for example, a complaint) in a civil case, you **must** complete and file, along with your first paper, the *Civil Case Cover Sheet* contained on page 1. This information will be used to compile statistics about the types and numbers of cases filed. You must complete items 1 through 6 on the sheet. In item 1, you must check **one** box for the case type that best describes the case. If the case fits both a general and a more specific type of case listed in item 1, check the more specific one. If the case has multiple causes of action, check the box that best indicates the **primary** cause of action. To assist you in completing the sheet, examples of the cases that belong under each case type in item 1 are provided below. A cover sheet must be filed only with your initial paper. Failure to file a cover sheet with the first paper filed in a civil case may subject a party, its counsel, or both to sanctions under rules 2.30 and 3.220 of the California Rules of Court.

**To Parties in Rule 3.740 Collections Cases.** A "collections case" under rule 3.740 is defined as an action for recovery of money owed in a sum stated to be certain that is not more than $25,000, exclusive of interest and attorney's fees, arising from a transaction in which property, services, or money was acquired on credit. A collections case does not include an action seeking the following: (1) tort damages, (2) punitive damages, (3) recovery of real property, (4) recovery of personal property, or (5) a prejudgment writ of attachment. The identification of a case as a rule 3.740 collections case on this form means that it will be exempt from the general time-for-service requirements and case management rules, unless a defendant files a responsive pleading. A rule 3.740 collections case will be subject to the requirements for service and obtaining a judgment in rule 3.740.

**To Parties in Complex Cases.** In complex cases only, parties must also use the *Civil Case Cover Sheet* to designate whether the case is complex. If a plaintiff believes the case is complex under rule 3.400 of the California Rules of Court, this must be indicated by completing the appropriate boxes in items 1 and 2. If a plaintiff designates a case as complex, the cover sheet must be served with the complaint on all parties to the action. A defendant may file and serve no later than the time of its first appearance a joinder in the plaintiff's designation, a counter-designation that the case is not complex, or, if the plaintiff has made no designation, a designation that the case is complex.

### CASE TYPES AND EXAMPLES

**Auto Tort**
Auto (22)–Personal Injury/Property
  Damage/Wrongful Death
Uninsured Motorist (46) *(if the*
  *case involves an uninsured*
  *motorist claim subject to*
  *arbitration, check this item*
  *instead of Auto)*

**Other PI/PD/WD (Personal Injury/**
**Property Damage/Wrongful Death)**
**Tort**
Asbestos (04)
  Asbestos Property Damage
  Asbestos Personal Injury/
    Wrongful Death
Product Liability *(not asbestos or*
  *toxic/environmental)* (24)
Medical Malpractice (45)
  Medical Malpractice–
    Physicians & Surgeons
  Other Professional Health Care
    Malpractice
Other PI/PD/WD (23)
  Premises Liability (e.g., slip
    and fall)
  Intentional Bodily Injury/PD/WD
    (e.g., assault, vandalism)
  Intentional Infliction of
    Emotional Distress
  Negligent Infliction of
    Emotional Distress
  Other PI/PD/WD

**Non-PI/PD/WD (Other) Tort**
Business Tort/Unfair Business
  Practice (07)
Civil Rights (e.g., discrimination,
  false arrest) *(not civil*
  *harassment)* (08)
Defamation (e.g., slander, libel)
  (13)
Fraud (16)
Intellectual Property (19)
Professional Negligence (25)
  Legal Malpractice
  Other Professional Malpractice
    *(not medical or legal)*
Other Non-PI/PD/WD Tort (35)
**Employment**
Wrongful Termination (36)
Other Employment (15)

**Contract**
Breach of Contract/Warranty (06)
  Breach of Rental/Lease
    Contract *(not unlawful detainer*
    *or wrongful eviction)*
  Contract/Warranty Breach–Seller
    Plaintiff *(not fraud or negligence)*
  Negligent Breach of Contract/
    Warranty
  Other Breach of Contract/Warranty
Collections (e.g., money owed, open
  book accounts) (09)
  Collection Case–Seller Plaintiff
  Other Promissory Note/Collections
    Case
Insurance Coverage *(not provisionally*
  *complex)* (18)
  Auto Subrogation
  Other Coverage
Other Contract (37)
  Contractual Fraud
  Other Contract Dispute
**Real Property**
Eminent Domain/Inverse
  Condemnation (14)
Wrongful Eviction (33)
Other Real Property (e.g., quiet title) (26)
  Writ of Possession of Real Property
  Mortgage Foreclosure
  Quiet Title
  Other Real Property *(not eminent*
    *domain, landlord/tenant, or*
    *foreclosure)*
**Unlawful Detainer**
Commercial (31)
Residential (32)
Drugs (38) *(if the case involves illegal*
  *drugs, check this item; otherwise,*
  *report as Commercial or Residential)*
**Judicial Review**
Asset Forfeiture (05)
Petition Re: Arbitration Award (11)
Writ of Mandate (02)
  Writ–Administrative Mandamus
  Writ–Mandamus on Limited Court
    Case Matter
  Writ–Other Limited Court Case
    Review
Other Judicial Review (39)
  Review of Health Officer Order
  Notice of Appeal–Labor
    Commissioner Appeals

**Provisionally Complex Civil Litigation (Cal.**
**Rules of Court Rules 3.400–3.403)**
Antitrust/Trade Regulation (03)
Construction Defect (10)
Claims Involving Mass Tort (40)
Securities Litigation (28)
Environmental/Toxic Tort (30)
Insurance Coverage Claims
  *(arising from provisionally complex*
  *case type listed above)* (41)
**Enforcement of Judgment**
Enforcement of Judgment (20)
  Abstract of Judgment (Out of
    County)
  Confession of Judgment *(non-*
    *domestic relations)*
  Sister State Judgment
  Administrative Agency Award
    *(not unpaid taxes)*
  Petition/Certification of Entry of
    Judgment on Unpaid Taxes
  Other Enforcement of Judgment
    Case
**Miscellaneous Civil Complaint**
RICO (27)
Other Complaint *(not specified*
  *above)* (42)
  Declaratory Relief Only
  Injunctive Relief Only *(non-*
    *harassment)*
  Mechanics Lien
  Other Commercial Complaint
    Case *(non-tort/non-complex)*
  Other Civil Complaint
    *(non-tort/non-complex)*
**Miscellaneous Civil Petition**
Partnership and Corporate
  Governance (21)
Other Petition *(not specified*
  *above)* (43)
  Civil Harassment
  Workplace Violence
  Elder/Dependent Adult
    Abuse
  Election Contest
  Petition for Name Change
  Petition for Relief From Late
    Claim
  Other Civil Petition



# Superior Court of California, County of Alameda
# Alternative Dispute Resolution (ADR) Information Packet

The person who files a civil lawsuit (plaintiff) must include the ADR Information Packet with the complaint when serving the defendant. Cross complainants must serve the ADR Information Packet on any new parties named to the action.

> The Court *strongly encourages* the parties to use some form of ADR before proceeding to trial. You may choose ADR by:
>
> - Indicating your preference on Case Management Form CM-110;
>
> - Filing the Stipulation to ADR and Delay Initial Case Management Conference for 90 Days (a local form included with the information packet); or
>
> - Agree to ADR at your Initial Case Management Conference.
>
> **QUESTIONS?** Call (510) 891-6055. Email adrprogram@alameda.courts.ca.gov
> Or visit the court's website at http://www.alameda.courts.ca.gov/adr

## What Are The Advantages Of Using ADR?

- *Faster* –Litigation can take years to complete but ADR usually takes weeks or months.

- *Cheaper* – Parties can save on attorneys' fees and litigation costs.

- *More control and flexibility* – Parties choose the ADR process appropriate for their case.

- *Cooperative and less stressful* – In mediation, parties cooperate to find a mutually agreeable resolution.

- *Preserve Relationships* – A mediator can help you effectively communicate your interests and point of view to the other side. This is an important benefit when you want to preserve a relationship.

## What Is The Disadvantage Of Using ADR?

- *You may go to court anyway* – If you cannot resolve your dispute using ADR, you may still have to spend time and money resolving your lawsuit through the courts.

## What ADR Options Are Available?

- *Mediation* – A neutral person (mediator) helps the parties communicate, clarify facts, identify legal issues, explore settlement options, and agree on a solution that is acceptable to all sides.

  o **Court Mediation Program:** Mediators do not charge fees for the first two hours of mediation. If parties need more time, they must pay the mediator's regular fees.

Some mediators ask for a deposit before mediation starts which is subject to a refund for unused time.

- o **Private Mediation**: This is mediation where the parties pay the mediator's regular fees and may choose a mediator outside the court's panel.

- *Arbitration* – A neutral person (arbitrator) hears arguments and evidence from each side and then decides the outcome of the dispute. Arbitration is less formal than a trial and the rules of evidence are often relaxed. Arbitration is effective when the parties want someone other than themselves to decide the outcome.

  - o **Judicial Arbitration Program** (non-binding): The judge can refer a case or the parties can agree to use judicial arbitration. The parties select an arbitrator from a list provided by the court. If the parties cannot agree on an arbitrator, one will be assigned by the court. There is no fee for the arbitrator. The arbitrator must send the decision (award of the arbitrator) to the court. The parties have the right to reject the award and proceed to trial.

  - o **Private Arbitration** (binding and non-binding) occurs when parties involved in a dispute either agree or are contractually obligated. This option takes place outside of the courts and is normally binding meaning the arbitrator's decision is final.

### Mediation Service Programs In Alameda County

Low cost mediation services are available through non-profit community organizations. Trained volunteer mediators provide these services. Contact the following organizations for more information:

**SEEDS Community Resolution Center**
2530 San Pablo Avenue, Suite A, Berkeley, CA 94702-1612
Telephone: (510) 548-2377    Website: www.seedscrc.org
Their mission is to provide mediation, facilitation, training and education programs in our diverse communities – Services that Encourage Effective Dialogue and Solution-making.

**Center for Community Dispute Settlement**
291 McLeod Street, Livermore, CA 94550
Telephone: (925) 373-1035    Website: www.trivalleymediation.com
CCDS provides services in the Tri-Valley area for all of Alameda County.

*For Victim/Offender Restorative Justice Services*
**Catholic Charities of the East Bay: Oakland**
433 Jefferson Street, Oakland, CA 94607
Telephone: (510) 768-3100    Website: www.cceb.org
Mediation sessions involve the youth, victim, and family members work toward a mutually agreeable restitution agreement.

**ALA ADR-001**

| | |
|---|---|
| ATTORNEY OR PARTY WITHOUT ATTORNEY (*Name, State Bar number, and address*) | FOR COURT USE ONLY |

TELEPHONE NO.:                    FAX NO. (*Optional*):
E-MAIL ADDRESS (*Optional*):
ATTORNEY FOR (*Name*):

**SUPERIOR COURT OF CALIFORNIA, ALAMEDA COUNTY**

STREET ADDRESS:
MAILING ADDRESS:
CITY AND ZIP CODE:
BRANCH NAME

PLAINTIFF/PETITIONER:

DEFENDANT/RESPONDENT:

| | |
|---|---|
| **STIPULATION TO ATTEND ALTERNATIVE DISPUTE RESOLUTION (ADR) AND DELAY INITIAL CASE MANAGEMENT CONFERENCE FOR 90 DAYS** | CASE NUMBER: |

**INSTRUCTIONS: All applicable boxes must be checked, and the specified information must be provided.**

This stipulation is effective when:

- All parties have signed and filed this stipulation with the Case Management Conference Statement at least 15 days before the initial case management conference.
- A copy of this stipulation has been received by the ADR Program Administrator, 1225 Fallon Street, Oakland, CA 94612.

1.  Date complaint filed: _____. An **Initial Case Management Conference** is scheduled for:

    Date:                     Time:                     Department:

2.  Counsel and all parties certify they have met and conferred and have selected the following ADR process (*check one*):

    ☐ Court mediation          ☐ Judicial arbitration
    ☐ Private mediation        ☐ Private arbitration

3.  All parties agree to complete ADR within 90 days and certify that:

    a.  No party to the case has requested a complex civil litigation determination hearing;
    b.  All parties have been served and intend to submit to the jurisdiction of the court;
    c.  All parties have agreed to a specific plan for sufficient discovery to make the ADR process meaningful;
    d.  Copies of this stipulation and self-addressed stamped envelopes are provided for returning endorsed filed stamped copies to counsel and all parties;
    e.  Case management statements are submitted with this stipulation;
    f.  All parties will attend ADR conferences; and,
    g.  The court will not allow more than 90 days to complete ADR.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Date:

_____          ▶ _____
(TYPE OR PRINT NAME)                              (SIGNATURE OF PLAINTIFF)

Date:

_____          ▶ _____
(TYPE OR PRINT NAME)                              (SIGNATURE OF ATTORNEY FOR PLAINTIFF)

Form Approved for Mandatory Use
Superior Court of California,
County of Alameda
ALA ADR-001 [New January 1, 2010]   **STIPULATION TO ATTEND ALTERNATIVE DISPUTE RESOLUTION (ADR) AND DELAY INITIAL CASE MANAGEMENT CONFERENCE FOR 90 DAYS**   Cal. Rules of Court, rule 3.221(a)(4)

ALA ADR-001

| PLAINTIFF/PETITIONER: | CASE NUMBER.: |
|---|---|
| DEFENDANT/RESPONDENT: | |

Date:

_____

(TYPE OR PRINT NAME)

▶ _____

(SIGNATURE OF DEFENDANT)

Date:

_____

(TYPE OR PRINT NAME)

▶ _____

(SIGNATURE OF ATTORNEY FOR DEFENDANT)

Form Approved for Mandatory Use
Superior Court of California,
County of Alameda
ALA ADR-001 [New January 1, 2010]

**STIPULATION TO ATTEND ALTERNATIVE DISPUTE RESOLUTION (ADR)
AND DELAY INITIAL CASE MANAGEMENT CONFERENCE FOR 90 DAYS**

Cal. Rules of Court,
rule 3.221(a)(4)

⌐ Blood Hurst & O'Reardon, LLP          ¬       ⌐ Premier Nutrition Corporation          ¬
  Attn: Blood, Timothy G.
  501 West Broadway
  Suite 1490
∟ San Diego, CA  92101                  ⌋       ∟                                        ⌋

---

### Superior Court of California, County of Alameda
### Rene C. Davidson Alameda County Courthouse

| Bland | |
|---|---|
| Plaintiff/Petitioner(s) | No. <u>RG19002714</u> |
| VS. | |
| Premier Nutrition Corporation | NOTICE OF HEARING |
| Defendant/Respondent(s) | |
| (Abbreviated Title) | |

To each party or to the attorney(s) of record for each party herein:

Notice is hereby given that the above-entitled action has been set for:

> Complex Determination Hearing
> Case Management Conference

You are hereby notified to appear at the following Court location on the date and time noted below:

Complex Determination Hearing:
DATE: 03/06/2019    TIME: 09:00 AM    DEPARTMENT: 21
LOCATION:  Administration Building, Fourth Floor
          1221 Oak Street, Oakland

Case Management Conference:
DATE: 04/09/2019    TIME: 09:01 AM    DEPARTMENT: 21
LOCATION:  Administration Building, Fourth Floor
          1221 Oak Street, Oakland

Pursuant to California Rules of Court, Rule 3.400 et seq. and Local Rule 3.250 (Unified Rules of the Superior Court, County of Alameda), the above-entitled matter is set for a Complex Litigation Determination Hearing and Initial Complex Case Management Conference.

Department 21 issues tentative rulings on DomainWeb (www.alameda.courts.ca.gov/domainweb). For parties lacking access to DomainWeb, the tentative ruling must be obtained from the clerk at (510) 267-6937.  Please consult Rule 3.30(c) of the Unified Rules of the Superior Court, County of Alameda, concerning the tentative ruling procedures for Department 21.

Counsel or party requesting complex litigation designation is ordered to serve a copy of this notice on all parties omitted from this notice or brought into the action after this notice was mailed.

All counsel of record and any unrepresented parties are ordered to attend this Initial Complex Case Management Conference unless otherwise notified by the Court.

Failure to appear, comply with local rules or provide a Case Management Conference statement may result in sanctions.  Case Management Statements may be filed by E-Delivery, by submitting directly to the E-Delivery Fax Number (510) 267-5732.  No fee is charged for this service.  For further information, go to **Direct Calendar Departments** at

http://apps.alameda.courts.ca.gov/domainweb.

All motions in this matter to be heard prior to Complex Litigation Determination Hearing must be scheduled for hearing in Department 21.

If the information contained in this notice requires change or clarification, please contact the courtroom clerk for Department 21 by e-mail at Dept.21@alameda.courts.ca.gov or by phone at (510) 267-6937.

TELEPHONIC COURT APPEARANCES at Case Management Conferences may be available by contacting CourtCall, an independent vendor, at least 3 business days prior to the scheduled conference. Parties can make arrangements by calling (888) 882-6878, or faxing a service request form to (888) 883-2946. This service is subject to charges by the vendor.

Dated: 01/16/2019          Chad Finke  Executive Officer / Clerk of the Superior Court

                           By  _____

                                                      Deputy Clerk

---

## CLERK'S CERTIFICATE OF MAILING

I certify that the following is true and correct:  I am the clerk of the above-named court and not a party to this cause.  I served this Notice by placing copies in envelopes addressed as shown hereon and then by sealing and placing them for collection, stamping or metering with prepaid postage, and mailing on the date stated below, in the United States mail at Alameda County, California, following standard court practices.

Executed on 01/17/2019.

                           By  _____

                                                      Deputy Clerk